**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 38127**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **2012 Opinion No. 41** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Filed:  August 1, 2012** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **DAVID LOREN CURRY,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County.  Hon. Lansing L. Haynes, District Judge.

Judgment of conviction for burglary, aggravated assault, unlawful possession of a firearm, and being a persistent violator, <u>vacated</u> and <u>case remanded</u>.

Nevin, Benjamin, McKay & Bartlett LLP, Boise, for appellant.  Deborah A. Whipple argued.

Hon. Lawrence G. Wasden, Attorney General; Nicole L. Schafer, Deputy Attorney General, Boise, for respondent.  Nicole L. Schafer argued.

_____

GUTIERREZ, Judge

David Loren Curry appeals from the district court's judgment of conviction for burglary, aggravated assault, unlawful possession of a firearm, and being a persistent violator. Specifically, Curry argues the judgment of conviction should be vacated for three reasons: (1) the evidence was insufficient to prove the offenses; (2) the district court erred in denying Curry's request for a self-defense jury instruction; and (3) the district court erred in denying Curry's motion for a new trial.  For the reasons set forth below, we vacate the judgment.

**I.**

**FACTS AND PROCEDURE**

This criminal case arose from events that took place in February 2010.  According to evidence presented at Curry's trial, events unfolded as follows.  At that time, Melissa Ferra and Curry had recently ended their romantic relationship.  Prior to the end of that relationship, Curry would often spend time with Ferra; Ferra's cousin, Marlisa Gordon; and Gordon's fiancé, Travis

1

Escudero, at Gordon's home. In mid-February, Ferra learned from police that her car had been wrecked and abandoned, and she believed Curry was responsible. After notifying the police about her suspicions, Ferra decided to stay with Gordon that night. Ferra and Gordon awoke on February 18 to find the word "snitch" written on Gordon's front door and a black oily substance on the hood of Gordon's car. Gordon contacted the police.

On the evening of February 20, Ferra, Gordon, and Escudero were at Gordon's home. Curry called Gordon's phone, but Escudero answered, to which Curry said, "I'm coming for you, buddy." Escudero told Ferra and Gordon about the phone call, and Ferra left the residence. Gordon and Escudero remained at the home and went out to the garage to smoke, where there was a couch and coffee table at which they could sit. Through the open garage door, Gordon saw a person approaching from the driveway and relayed that to Escudero. Escudero saw that it was Curry and that Curry was carrying clothes in one hand and had his other hand in his pocket. After entering the garage, Curry threw the clothes (which belonged to Ferra), started yelling about $100 that Gordon and Escudero owed him, and kicked over the coffee table. Escudero then stood and picked up a solid metal pole, about a foot and a half to two feet long, from near the couch. In response, Curry pulled his hand out of his pocket about an inch and said, "Do you want to go?" Escudero saw something black and metal in Curry's pocket, and as a person with recent military training and experience as a sniper, Escudero assumed it was a handgun. Curry, however, did not brandish the object so as to make it identifiable. The encounter ceased when Curry made an obscene gesture with his middle finger and walked away. Escudero and Gordon went into the house and contacted the police. The entire incident lasted roughly three to five minutes.

When police arrived, Escudero recounted what had happened. He said he assumed Curry had a handgun because of seeing something black in Curry's pocket and how Curry kept his hand there, but said he could not be sure if Curry carried a weapon. When questioned, Gordon stated she did not see anything in Curry's hands besides the clothes he was carrying when he first arrived. Executing a search warrant, police searched Curry's home and found no firearms. Curry's mother, with whom he lived, contacted police and told them about a handgun, which had been Curry's grandfather's, that she kept in a file box. Thereafter, officers returned to Curry's home and seized the handgun from under a number of files in the box located in her bedroom closet. Curry's mother stated she had no reason to believe that Curry knew the handgun was

2

present in the home, and when asked, Curry said he had last seen the handgun years before. When Curry spoke with police about the incident at Gordon's home, he stated there was an argument and confrontation, but made no mention of a weapon. In the words of the detective, Curry "denied that he displayed any gun." However, Curry did admit responsibility to the police, and to his brother, for writing on Gordon's door and pouring oil on her car. Two days after the incident in the garage, Curry's brother overheard Curry on the phone talking about a "gun," but did not hear other details of the conversation.

The State charged Curry with burglary for entry into the garage with the intent to commit the crime of witness intimidation and/or aggravated assault, aggravated assault on Escudero by threatening him with a firearm, unlawful possession of a firearm,[1] malicious injury to property for vandalizing Gordon's car and front door, and a sentencing enhancement for being a persistent violator. Curry pled guilty to malicious injury to property, but exercised his right to a jury trial on the burglary and aggravated assault charges.[2]

The jury found Curry guilty of both burglary and aggravated assault. Without conceding the jury verdict was supported by sufficient evidence, Curry admitted to having three prior felonies. Thereafter, the court held a bench trial on the unlawful possession of a firearm charge, found Curry guilty, and also found Curry was a persistent violator. Curry made a timely motion for a new trial. He asserted the verdicts were contrary to the law and evidence because of the insufficiency of the evidence and because the jury was overwhelmed with hearsay evidence, resulting in an unfair trial. The district court denied the motion. After entering judgments of conviction,[3] the court imposed concurrent sentences as follows: a unified sentence of fourteen years, with three years determinate, for burglary, Idaho Code § 18-1401; a unified sentence of fifteen years, with five years determinate, for aggravated assault, Idaho Code §§ 18-901, 18-905; a unified sentence of thirteen years, with four years determinate, for unlawful possession of a firearm, Idaho Code § 18-3316; and 180 days for malicious injury to property, Idaho Code

---

[1]     Curry had a previous felony conviction.

[2]     The jury trial was limited to the charges of burglary and aggravated assault, and the parties stipulated that, if the jury returned verdicts of guilty, there would be a bench trial on the charge of unlawful possession of a firearm and the persistent violator enhancement.

[3]     The malicious injury to property conviction was contained within a separate judgment from the remaining convictions.

3

§ 18-7001. Curry timely appeals from the judgment of conviction relating to burglary, aggravated assault, and unlawful possession of a firearm, with the sentencing enhancement for being a persistent violator. Curry asserts three errors: (1) the evidence was insufficient to support the judgment of conviction; (2) the court erred in denying his request for a jury instruction on self-defense; and (3) the court erred in denying the motion for a new trial. Because we conclude the first issue is dispositive in this case, we do not reach Curry's second or third assignments of error.

## II.

## DISCUSSION

The standard of review for sufficiency of the evidence for a judgment of conviction entered upon a jury verdict is whether there was substantial evidence upon which a reasonable trier of fact could have found the prosecution sustained its burden of proving the essential elements of the crime beyond a reasonable doubt. *State v. Hoyle*, 140 Idaho 679, 684, 99 P.3d 1069, 1074 (2004); *State v. Lawyer*, 150 Idaho 170, 172, 244 P.3d 1256, 1258 (Ct. App. 2010). We do not substitute our view for that of the jury as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Lawyer*, 150 Idaho at 172, 244 P.3d at 1258; *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct. App. 1991). Moreover, we consider the evidence in the light most favorable to the prosecution. *Lawyer*, 150 Idaho at 172, 244 P.3d at 1258; *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998). If we determine the evidence is insufficient, the defendant is entitled to acquittal. *See Herrera-Brito*, 131 Idaho at 385, 957 P.2d at 1101.

Curry argues the convictions for burglary and aggravated assault must be set aside and acquittals entered, asserting the evidence was insufficient. Upon reversal of those two convictions, Curry contends the conviction for unlawful possession of a firearm and the finding that he was a persistent violator must also be reversed and acquittal entered. The State responds that there is sufficient evidence upon which a reasonable juror could find that Curry entered the garage with the necessary intent for burglary (either the intent to intimidate Ferra or to commit aggravated assault) and find that a deadly weapon was used in the commission of the assault on Escudero.

4

## A.    Burglary

Count I of the second amended information charged Curry with burglary for entry into Gordon's residence with the intent to "commit the crime of witness intimidation and/or aggravated assault." At trial, the State's theory regarding the witness intimidation component was that Curry came into the garage with the intent to intimidate Ferra because he believed she had reported to police that he wrecked her car. Curry argues he could not have entered the garage with the intent to intimidate a witness for two reasons: (1) because no criminal proceeding was pending; and (2) because, at the point in time he approached the garage, it was apparent Ferra was not present.

The essential elements of burglary are entry with the intent to commit a felony. I.C. § 18-1401; Idaho Criminal Jury Instruction (ICJI) 511. In looking at whether Curry had the necessary intent to commit the felony of witness intimidation, even though a criminal proceeding was not pending at the time, we look to the statute. This Court exercises free review over the application and construction of statutes. *State v. Reyes*, 139 Idaho 502, 505, 80 P.3d 1103, 1106 (Ct. App. 2003). Where the language of a statute is plain and unambiguous, this Court must give effect to the statute as written, without engaging in statutory construction. *State v. Burnight*, 132 Idaho 654, 659, 978 P.2d 214, 219 (1999); *State v. Escobar*, 134 Idaho 387, 389, 3 P.3d 65, 67 (Ct. App. 2000). The language of the statute is to be given its plain, obvious, and rational meaning. *Burnight*, 132 Idaho at 659, 978 P.2d at 219. If the language is clear and unambiguous, there is no occasion for the court to resort to legislative history or rules of statutory interpretation. *Escobar*, 134 Idaho at 389, 3 P.3d at 67. When this Court must engage in statutory construction because an ambiguity exists, it has the duty to ascertain the legislative intent and give effect to that intent. *State v. Beard*, 135 Idaho 641, 646, 22 P.3d 116, 121 (Ct. App. 2001). To ascertain such intent, not only must the literal words of the statute be examined, but also the context of those words, the public policy behind the statute, and its legislative history. *Id.* It is incumbent upon a court to give an ambiguous statute an interpretation that will not render it a nullity. *Id.* Constructions of an ambiguous statute that would lead to an absurd result are disfavored. *State v. Doe*, 140 Idaho 271, 275, 92 P.3d 521, 525 (2004).

Idaho Code § 18-2604(3) criminalizes a defendant's intimidation of a witness who may testify in the future.[4]  *State v. Mercer*, 143 Idaho 123, 126, 138 P.3d 323, 326 (Ct. App. 2005), *aff'd*, 143 Idaho 108, 138 P.3d 308 (2006).  Upon interpretation of the statute in *Mercer*, this Court stated:

> [This] subsection[] criminalize[s] the intimidation of a witness that the defendant *believes* will testify. . . .  That is, if a defendant believes that a person may be called as a witness . . . , he may be guilty of intimidating a witness *irrespective of whether either party ever intended to call the victim of this intimidation as a witness*.  Giving effect to every word and clause of the statute, we also must consider I.C. § 18-2604(5), which states that it is not a defense that the person actually testified, eliminating the possibility that actual alteration of the person's testimony is required for violations of I.C. §[] 18-2604(3) . . . .  The effect . . . is to criminalize the defendant's conduct alone and not to make the criminality of the conduct subject to the defendant's success in influencing or preventing the witness' testimony.  The crime is committed or completed at the time the threat is made not at the time the testimony is offered.

*Mercer*, 143 Idaho at 126, 138 P.3d at 326 (emphasis added).

Whether a criminal proceeding was pending is irrelevant to whether Curry entered the garage with the intent to intimidate a witness.  In accord with the broad wording in the statute and this Court's previous interpretation, if a defendant believes a witness may testify in the future at a criminal proceeding he believes may ensue and intimidates that witness in violation of this statute, his guilt does not turn on whether a criminal proceeding has already been formally initiated.

The remaining question is whether there was substantial evidence that would support the essential elements of the crime beyond a reasonable doubt--that is, whether there was substantial evidence that, at the time of his entry, Curry intended to intimidate Ferra, believing Ferra would be found at the home (whether he saw her in the garage or not), and that he believed she may be called as a witness in some future proceeding.  Guilt of burglary does not require completion of the intended felony after entry.  *See Matthews v. State*, 113 Idaho 83, 86, 741 P.2d 370, 373 (Ct.

---

[4]  Idaho Code § 18-2604(3) states in relevant part:

> Any person who, . . . by any threats to person or property, or by any manner willfully intimidates, influences, impedes, deters, threatens, harasses, obstructs or prevents, a witness, . . . or any person who may be called as a witness or any person he believes may be called as a witness in any criminal proceeding . . . from testifying freely, fully and truthfully in that criminal proceeding . . . is guilty of a felony.

App. 1987) (holding burglary is completed upon entry with the intent to commit theft and that the theft or other felony need not actually be committed). Additionally, a jury may infer intent from the defendant's conduct or from circumstantial evidence. *State v. Pole*, 139 Idaho 370, 373, 79 P.3d 729, 732 (Ct. App. 2003).

The State presented evidence that Ferra often stayed with Gordon and spent a considerable amount of time at Gordon's home. Before the end of his relationship with Ferra, Curry had often spent time with Ferra at Gordon's residence. There was testimony about Ferra's wrecked and abandoned car, and the State also introduced evidence that Curry vandalized Gordon's car, by pouring oil on it, and home, by writing the word "snitch" on the door, during a time when Ferra was staying with Gordon. When Curry arrived at Gordon's residence on the evening of February 20 and entered the garage, he was carrying clothes belonging to Ferra, but Ferra was not present. The district court found:

> [T]here is evidence sufficient in this record by which a reasonable juror would infer that Mr. Curry entered the garage intending to intimidate Melissa Ferra in that there was evidence that she lived at that house, was at that house frequently, that the word "snitch" was written on that door in reference to her at that house, and the oily substance poured over the car at that house where she lived. So a reasonable jury could infer that his reason for entering that garage was to intimidate a person who he believed may be a witness in a criminal proceeding in that he believed that she had, in the vernacular, "snitched him off to the police about the car wreck incident."

At the outset, the evidence regarding malicious injury to property does not support a finding that Curry necessarily faulted Ferra as the "snitch." Evidence showed Ferra did not tell Curry she had spoken with police about her car and that police had decided, prior to Ferra's discussions with them, to not pursue any charges against Curry in regard to the accident.[5] The record is silent as to whether Curry otherwise knew that Ferra or someone else had spoken to police about the car. Also of significance, Curry wrote "snitch" on the front door of a house not owned by Ferra, but owned by Gordon. The vandalized car was also owned by Gordon. Looking to the night of February 20, in the phone call preceding Curry's arrival, Curry called Gordon's phone, not Ferra's. When Escudero answered, Curry stated, "I'm coming for *you*, buddy." (Emphasis added.) Curry did not reference Ferra in the phone call, but directed his statements to Escudero, and consequently, the context of that call gives no indication of Curry's

---

[5]    A witness to the accident identified an individual other than Curry as the driver of Ferra's car.

intent to confront, threaten, hassle, or otherwise intimidate Ferra. The evidence of what occurred in the garage does not support such inferences either. Though Curry knew Ferra was often at Gordon's residence and was carrying clothes belonging to Ferra, Curry entered the garage without Ferra being present and confronted Escudero and Gordon about money those two owed him. There is no evidence he yelled or screamed about being "snitched" on or even mentioned Ferra, beyond indicating that the clothes he carried were hers. In short, the evidence is insufficient to demonstrate any intent by Curry to single out Ferra upon entering the garage and cannot support a conviction of burglary on that theory.

Curry also argues the evidence was insufficient on the burglary charge to show that he entered with the intent to commit aggravated assault. We address this argument in our subsequent discussion of the aggravated assault charge.

B.     Aggravated Assault

Count II of the second amended information charged Curry with aggravated assault, alleging he committed an assault upon Escudero "with a deadly weapon." Curry argues the evidence is insufficient to support the conviction of aggravated assault for two reasons. First, Curry points out that the alleged assault occurred after Escudero grabbed the metal pipe. Curry asserts this sequence of events undermines the State's second theory of burglary, that he entered with the intent to commit aggravated assault, and furthermore, supports Curry's theory of self-defense. Second, Curry argues the evidence was insufficient to establish the presence of a deadly weapon because Escudero could not say whether Curry was armed at the time he made a gesture towards Escudero and Gordon did not see a weapon.

Addressing his second point first, the essential elements the State must prove on a charge of aggravated assault are that the defendant committed an assault upon the victim with a deadly weapon or by any means of force likely to produce great bodily harm. I.C. § 18-905; ICJI 1205. As pled, the State in this case had to show beyond a reasonable doubt that Curry assaulted Escudero "with a deadly weapon."

The evidence produced at trial showed that Escudero, during the time Curry was in the garage, thought Curry had a handgun because Curry kept his hand in his pocket. Escudero testified he had a recent military background, had been a sniper deployed in Iraq, and was trained, in confrontational situations, to assume a person has a weapon if his hands are not visible. When Curry moved his hand slightly out of his coat pocket and said, "Do you want to

8

go?", Escudero saw "a black piece of steel that appeared to be a handle." Escudero believed it to be a handgun, but did not see a barrel, hammer, trigger, or any other mechanism that would confirm or dispel his belief. Escudero testified that "it could have been anything." Gordon, who was also present in the garage during the situation, testified Curry "was just freaking out with his hands in his pockets. I didn't see anything besides that." Specifically, when asked if she saw a gun, she replied, "No. I never did." Gordon further testified the situation lasted less than five minutes, mostly made her angry, and because of the way Curry was acting, she decided to call the police. The prosecutor also called Curry's brother to the stand, who testified he heard Curry on the phone, two days after the incident in the garage, speaking about a "gun," but that he did not pay attention to other details of the conversation. The prosecutor asked Curry's brother if he recalled Curry talking about "getting rid of a gun for a while or having a need to get rid of a gun." The brother replied, "No, sir." No witness was brought forward to impeach that testimony.

As other evidence of a weapon, the detective assigned to the case testified that the search of Curry's home, conducted three days after the incident in the garage, did not reveal any firearms. It was after Curry's mother, with whom Curry lived, called the police and notified them of a handgun in her home, which had belonged to her father, that any weapon was recovered. The mother testified that she did not believe Curry was aware of the handgun being in the home. The detective further testified that he did not photograph the file box from which the small handgun was recovered and did not fingerprint--for feasibility reasons--the handgun, its holster, the file box, or other evidence found in the home. In addition, Ferra testified that, in the year or so she dated Curry, she did not see Curry possess a gun, hear him talk of having a gun, or indicate he knew about any gun being present in his home. When asked, she testified that she did not remember telling police after the malicious injury to property incident, but before the incident in the garage, that she had seen Curry with a black-colored handgun approximately thirty days prior. She stated she was on drugs at the time and lied to people and stated her comment to the police to that effect was "not the truth." She then clarified, stating she did not remember the conversation with officers because she was high on drugs. She did not recall describing the firearm as a black-colored, small handgun, stating Curry told her it was his grandfather's, or telling officers that another person was present when she may have seen the handgun thirty days prior. She also did not recall having a conversation with a detective three

9

days after the incident in the garage where he showed her the handgun recovered from Curry's home and she stated it was the same handgun she had seen in Curry's possession previously. For impeachment purposes, the detective testified that Ferra had told him she had seen Curry with a black-colored handgun approximately thirty days prior to the incident in the garage and that Ferra identified the handgun recovered from Curry's home as that same weapon. The detective further testified that Ferra had told him she was afraid of Curry. Also for impeachment purposes, the State called an officer to testify that Ferra had told him she saw Curry with a black-colored handgun on prior occasions. Because the detective's and officer's testimony would be inadmissible hearsay if offered to prove the truth of Ferra's statements, see Idaho Rules of Evidence 801, 802, the court gave limiting instructions to the jury stating they could only consider the impeachment evidence for purposes of assessing Ferra's credibility as a witness, and not for the truth of the matters stated.

In denying Curry's motion for acquittal based on insufficiency of the evidence, the district court stated:

> There's evidence by which the Jury could also reasonably infer that [Curry] intended to commit aggravated assault on the occupants, at least Mr. Escudero, of that garage by the fact of the evidence that he kept his hand in his pocket, which had the black metallic object, at all times during the few minutes of confrontation. That he had his hand in his pocket as he walked in. He kept his hand in that pocket. And then as things began escalating, he pulled that object out. The Jury could infer that he intended to commit an assault with a deadly weapon or a firearm based on that evidence. They could infer that.
>
> The Jury could also infer that that object in this pocket was a handgun. They may not find that. They may find that. It would be a reasonable inference under all of the circumstances of this record for them to make that decision that the State has proved that this was a handgun with which Mr. Curry committed the other elements of assault.

Curry asserts this decision was in error because the evidence is not enough to show he assaulted Escudero "with a deadly weapon." The State argues that Escudero's belief and the identification of something black, coupled with the prior phone call and Curry's demeanor, is sufficient evidence.

The question presented is a narrow one of what level of evidence is required to support a jury finding that a defendant actually had a deadly weapon, as an element of the charge, when the victim cannot identify a firearm or other weapon. Where an object in the defendant's possession at the commission of the crime was not positively identified as a weapon, the Idaho

Supreme Court upheld a conviction where circumstantial evidence provided a close connection between the defendant's possession of the object and its recovery and confirmation as a weapon. *See State v. Daniels*, 134 Idaho 896, 900, 11 P.3d 1114, 1118 (2000). In *Daniels*, the Idaho Supreme Court found substantial evidence supported a conviction of aggravated assault where the defendant was seen holding a black object before he discarded it as he was confronted by an officer from the rear and a .45 caliber handgun was shortly thereafter retrieved from the bushes where the defendant's "black object" had been discarded. *Id.* at 900, 11 P.3d at 1118. However, the case at hand presents evidence far more attenuated than what was presented in *Daniels*, and because sufficiency of the evidence turns on the specific facts of the case, there is no clear line delineated between what is and is not sufficient.

In looking to other jurisdictions with statutory provisions similar to Idaho requiring the presence of a deadly weapon[6] and that have addressed the question of what evidence is sufficient to support such a finding, we ascertain that they tend to require a close connection--as the Idaho Supreme Court found in *Daniels*--between the visual of an unidentified object and locating the deadly weapon, or the presence of an unidentified object coupled with a statement by the accused that he or she is in possession of a deadly weapon. A statement by the defendant, for example, that he or she has a gun or will shoot the victim necessarily implies that the defendant is armed with a deadly weapon. *See McBride v. Commonwealth*, 484 S.E.2d 165 (Va. Ct. App. 1997) (en banc) (upholding a conviction of using a firearm during a robbery where the defendant pushed an object into the victim's back and said, "Don't turn around or I'll shoot," but victim did not see a gun). In *McBride*, the Court of Appeals of Virginia reasoned that "circumstantial evidence, such as an assailant's statement that he possesses a firearm, can be sufficient evidence to prove beyond a reasonable doubt that an accused indeed possessed a firearm." *Id.* at 167. Similarly, in *Barehill v. State*, 740 S.W.2d 572 (Tex. Ct. App. 1987), the Court of Appeals of Texas held the evidence was sufficient to support a conviction for aggravated robbery even

---

[6]    These cases include review of convictions for crimes other than aggravated assault, but in each, the presence of a deadly weapon was an element of the crime charged. The statutes addressed in these cases are distinguishable from those statutes that allow conviction on the reasonable belief of the victim that the defendant was armed. *See e.g. State v. Chisolm*, 771 So. 2d 205, 210 (La. Ct. App. 2000) (reviewing a conviction on an armed robbery statute where a defendant may be guilty when he "leads the victim to reasonably believe he is armed with a dangerous weapon").

11

though the victim did not see the gun. There, the defendant stated he had a gun and did not want to shoot anyone, and the same defendant used a gun in another robbery committed under similar circumstances just three days later. *Id.* at 574.

However, in *Gray v. State*, 903 N.E.2d 940 (Ind. 2009), the Supreme Court of Indiana held the evidence was insufficient to uphold a conviction for armed robbery where the defendant was apprehended just moments after the robbery and no weapon was found on his person, in the surrounding area, or in his vehicle. *Id.* at 946. The court distinguished between two robberies, both committed by the defendant, where in each of the robberies the victims believed the defendant was armed and the defendant made statements that he was armed. *Id*. at 945-46. The court stated that, without more, the evidence would have been sufficient to uphold the conviction, but because a weapon was not found immediately after the second robbery when the defendant was arrested, it could not uphold the conviction on the second charge. *Id*. at 946. The *Gray* court relied heavily on the reasoning of the Massachusetts Supreme Judicial Court in *Commonwealth v. Howard*, 436 N.E.2d 1211 (Mass. 1982). There, the Massachusetts court stated:

> The victim's apprehension is, of course, likely to be the same whether the defendant had a gun or only said he had a gun, but did not. The nature of any threats and a victim's apprehension may be relevant factors in sentencing a defendant on his conviction of unarmed robbery, but, in the absence of evidence warranting an inference beyond a reasonable doubt that a defendant, in fact, had some instrumentality in his possession, there can be no conviction of robbery while "armed with a dangerous weapon."

*Id.* at 1213.

In a case with facts most analogous to those here, the District Court of Appeals in Florida found the evidence was insufficient to sustain a conviction that relied on the use of a deadly weapon and used similar reasoning. *Butler v. State*, 602 So. 2d 1303, 1305 (Fla. Dist. Ct. App. 1992). There, the defendant robbed a dry-cleaning establishment while carrying a pair of pants folded over his arm, which showed the outline of a long, hard object under the clothing resembling a barrel of a gun. *Id.* at 1304. Both victims of the robbery assumed it was a gun, but conceded it could have been a different object with that general shape. *Id.* The defendant never stated he had a gun or intended to shoot them, and no evidence was presented that a gun or other weapon was found when the defendant was arrested. *Id.* The Florida court stated the statute for armed robbery required the presence of a firearm or other deadly weapon, and reasoned:

12

> [T]o secure a conviction pursuant to [Florida statute] for armed robbery while carrying a "firearm or other deadly weapon" or for armed robbery while carrying a "weapon," . . . the state must present evidence which would be legally sufficient to permit a jury to conclude that the defendant *actually* carried a "firearm," "other deadly weapon" or a "weapon" . . . . In fact, it is not necessary that the victim "even be aware that a robber is armed, so long as the perpetrator has the weapon in his possession during the offense."

*Id.* at 1305 (citations omitted). The court went on to conclude, though the conduct of the defendant was such that he attempted to create the impression he had a gun, that evidence alone was insufficient to establish that the defendant actually carried a gun during the robbery--especially where neither victim saw a portion of the object, but saw only the impression of an "object having a shape similar to a gun barrel under the pants;" the defendant never stated he had a gun; and the defendant did not threaten to shoot either victim. *Id*. at 1306. *See also Lawless v. Commonwealth*, 323 S.W.3d 676, 677-80 (Ky. 2010) (holding the evidence was insufficient to support armed robbery where the defendant kept her hand in her pocket, no one saw a gun or any part of what could be described as a gun, the defendant never mentioned a gun, and a gun was not found upon arrest of the defendant a short distance from the robbery site); *People v. Banks*, 563 N.W.2d 200, 205 (Mich. 1997) (holding the evidence was insufficient to find the presence of a dangerous weapon where the defendant kept his hand in his pocket and never threatened to shoot, and the victim did not see any weapon or anything fashioned as a weapon); *cf. Hughey v. State*, 512 So. 2d 4, 5-6 (Miss. 1987) (upholding a conviction of armed robbery where the victim saw an imprint of a gun under the defendant's shirt and the defendant *threatened to shoot* the victims and later told a witness he had a gun during the robbery).

To summarize, other case law shows a victim's belief that the defendant was in possession of a weapon at the time he or she committed the crime is not, *by itself*, sufficient to support a conviction where an element of the crime requires that the act was committed with a weapon. If there is a belief the defendant had a weapon, that belief must be accompanied with either circumstantial evidence closely connecting a weapon to the defendant at the time the crime was committed--for example, the presence of wounds consistent with a weapon[7] or recovery of

---

[7] *See Lattimer v. State*, 499 S.E.2d 671, 672-73 (Ga. Ct. App. 1998) (upholding a conviction of aggravated assault even though the victims saw no weapon during the assault, but where one victim received a cut on her head, the other received a gash on his hand, each victim believed at the time they were cut with a boxcutter (though they later recanted), and the defendant was later arrested with two boxcutters in his possession).

the weapon at a time and place correlating it to the crime scene[8]--*or* the belief must be accompanied with an affirmative statement by the defendant to the effect that the defendant is, in fact, armed.

The above circumstances may not be the exclusive means to show sufficient evidence to support a finding that a deadly weapon was present, but they are persuasive in demonstrating the minimum level of evidence necessary. In looking at the record at hand, we conclude the evidence was not sufficient to support an inference beyond a reasonable doubt that Curry assaulted Escudero "with a deadly weapon." In our review, we look to the substantive evidence. Here, the victim, Escudero, did not identify a weapon, but believed the black, metal object he saw to be one. Gordon testified that she never saw anything, besides the clothes, in Curry's hands and, when asked if it was a cold enough evening that a person might keep his hands in his pockets, she answered affirmatively. Curry made no affirmative statement, either in the phone call preceding his arrival or when in the garage, indicating he was armed with a deadly weapon or would shoot either person, and made an obscene gesture with only the middle finger of his hand, and not any weapon, before turning and leaving. Curry was not immediately arrested or searched. Therefore, the only evidence tending to establish the presence of a firearm *during* the assault is Escudero's equivocal testimony.

Regarding the handgun later recovered, the evidence does not provide a close connection through circumstantial evidence either that Curry had it in his possession at all or specifically on the night of the assault. In the search of Curry's residence three days later, no firearm was found until Curry's mother notified police and they recovered a weapon from her bedroom closet located under a number of files within a file box. There is no fingerprint evidence from any of the seized items connecting the handgun to Curry, and even if there had been, it would not necessarily add to any inference beyond a reasonable doubt that Curry possessed the handgun on the night he went to Gordon's home. There was testimony that Curry mentioned a "gun" two days after the incident in the garage, but the evidence provided no specifics as to the context or content of that conversation. Ferra testified she had never seen Curry with a gun and denied ever

---

[8]    *See Stamper v. State*, 662 P.2d 82, 93 (Wyo. 1983) (reversing a conviction for assault "while armed with a dangerous or deadly weapon" because the only evidence with respect to a deadly weapon were boots allegedly worn by the defendant, but no evidence at trial could connect the defendant with possession of the boots on the evening in question).

14

telling police that Curry had shown her a weapon a month earlier. Though she was later impeached, the hearsay evidence from the detective and officer regarding Curry's possession of a handgun may not be relied upon as substantive evidence that he possessed a weapon. Even if Ferra herself had testified consistently regarding what she told police, her observation of Curry with a handgun roughly thirty days prior to the assault would not provide a close connection showing that Curry was, in fact, in possession of a deadly weapon on the night of the assault. Accordingly, we conclude the evidence was insufficient to support an inference beyond a reasonable doubt that Curry had a deadly weapon with which he assaulted Escudero.

In reaching this conclusion, we also reason that a conviction for burglary on the theory Curry entered the garage with the intent to commit aggravated assault cannot be sustained. Burglary is a specific intent crime, requiring that at the time of entry, the accused harbored the intent to commit a felony. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001. The State could not prove that Curry entered the garage with the intent to commit aggravated assault with a deadly weapon without showing he had some apparent ability to do so. *See* I.C. §§ 18-901 (defining assault as an unlawful attempt or threat to harm "coupled with apparent ability"), 18-905 (defining aggravated assault as an assault with one of three possible aggravating factors).

### III.

### CONCLUSION

We conclude the evidence was insufficient to show entry with the intent to intimidate Ferra or to commit aggravated assault. We further conclude the evidence was insufficient to show that Curry possessed a deadly weapon in order to sustain the conviction for aggravated assault. Because the evidence is insufficient to show Curry possessed the handgun at issue, there is also insufficient evidence upon which to sustain a conviction for unlawful possession of a firearm. Therefore, Curry shall be acquitted of the three charges, and the persistent violator enhancement is thereby nullified. Accordingly, we vacate the judgment of conviction and remand the case for entry of a judgment of acquittal.

Judge LANSING **CONCURS**.

Judge MELANSON **DISSENTING**

I respectfully dissent. In *State v. Cudd*, 137 Idaho 625, 51 P.3d 439 (Ct. App. 2002), this Court ruled that the victim's (and not the perpetrator's) reasonable perception of whether the weapon used in an assault is a deadly weapon is dispositive. That case involved the defendant

aiming an unloaded crossbow at the victim, which the victim believed to be loaded. The Court's ruling was based, in part, upon the rationale that the gravamen of the crime of assault is the effect of the perpetrator's conduct upon the perception and emotion of the victim. In my view, the same rationale should be extended to apply here. When Escudero answered Gordon's phone, Curry told him, "I'm coming for you, buddy." A short time later, Curry came to the residence as promised, entered the garage where Escudero was, threw a bag of Ferro's clothing, kicked over a coffee table, and was yelling about money Escudero owed him. During this time, Curry kept one hand in his pocket. When Escudero picked up a metal pipe, Curry slightly withdrew his hand from his pocket revealing part of a black object (which Escudero testified he believed to be the handle of a handgun) and said to Escudero, "Do you want to go?" In short, Curry threatened Escudero that he was coming for him and he did so. When Escudero armed himself, Curry displayed part of a black object in his pocket and challenged Escudero to fight. In my view, under these circumstances it was reasonable for Escudero to believe that Curry had a deadly weapon in his pocket and it is also almost certainly what Curry wanted him to believe. Escudero's reasonable belief was relevant competent evidence that the object in Curry's pocket was a deadly weapon.

In reviewing the sufficiency of the evidence for a judgment of conviction entered upon a jury verdict, we do not substitute our view for that of the jury as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct. App. 1991); *State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct. App. 1985). Moreover, we consider the evidence in the light most favorable to the prosecution. *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998); *Knutson*, 121 Idaho at 104, 822 P.2d at 1001. Applying these standards, I conclude that the convictions for aggravated assault and burglary should be affirmed. Therefore, with respect, I dissent.